UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6347-CR-ZLOCH

UNITED STATES OF AMERICA, :

    Plaintiff, :

vs. :

JOANN HOPE, :

    Defendant. :
_____/



## DEFENDANT'S MOTION FOR DOWNWARD DEPARTURE AND MEMORANDUM OF LAW

COMES NOW the defense and moves this court for a downward departure from the sentencing guidelines and in support thereof states:

This court has authority to depart in any case not falling within the "'heartland,' a set of typical cases embodying the conduct that each guideline describes" which were "carved out" by the Sentencing Commission. U.S.S.G. Introduction, p. 5, Ch. 1, Pt. A, § 4(b). "When the court finds an atypical case ... the court may consider whether a departure is authorized ... the Commission does not intend to limit the kinds of factors, whether or not mentioned elsewhere in the guidelines, that could constitute grounds for departure in the unusual case." *Id.* at 5-6.

Both Congress and the Sentencing Commission agreed that there would be times when various factors about a defendant would make a particular sentence inappropriate. Therefore, both Congress and the Sentencing Commission set out which factors, if substantially different in a case than in the normal or "heartland" case, should be considered as a bases for a downward departure from the usually appropriate Guideline range. U.S.S.G. Introduction, p. 5, Ch. 1, Pt. A, § 4(b) and

33

18 U.S.C. § 3553(b). The Guidelines provide:

> The sentencing statute permits a court to depart from a guideline-specified sentence ... when it finds "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

U.S.S.G. § 1A4(b), quoting 18 U.S.C. § 3553. *See United States v. Ponder*, 963 F.2d 1506, 1509-10 (11th Cir. 1992) (Eleventh Circuit supported a departure "even if the circumstances presented by the case vary only in degree from that presented by the guideline.").

The United States Supreme Court recently addressed the issue of guideline departures, in *Koon v. United States*, 116 S. Ct. 2035 (1996). The Supreme Court's *Koon* decision clarified and reemphasized that sentencing courts still have broad discretion to tailor appropriate sentences to the facts of a case.

Reversing a Ninth Circuit decision which had struck down the downward departures in *Koon*, the Supreme Court unanimously clarified that, from now on, departures should be reviewed on appeal only for abuse of discretion. *Id.* at 2043.[1] This ruling represented a significant change in the law of most Circuits, including this one. Prior to *Koon*, almost every Circuit had held that district court decisions about whether a factor could be used as a valid legal basis for departure must be reviewed *de novo*.

In *Koon*, the Supreme Court went out of its way to stress that its decision was designed to promote a view of the Sentencing Reform Act that retains much of the traditional sentencing discretion of district judges. While acknowledging the Sentencing Guidelines' goal of uniformity,

---

[1] While there were some concurring opinions in *Koon*, all of the Justices joined in the portions of the opinion discussed here, concerning the appropriate standard of review and the need for sentencing judges to retain substantial departure discretion.

2

Justice Kennedy explained:

> This too must be remembered, however. It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States District Judge. Discretion is reserved within the Sentencing Guidelines, and reflected by the standard of appellate review we adopt.

116 S. Ct. at 2053. In addition, "the text of § 3742 manifests an intent that district courts retain much of their traditional sentencing discretion." *Id.* at 2046. In fact, the Supreme Court stated that, unless the Commission itself had "proscribed, as a categorical matter, consideration of the factor," courts should not reject **any** factor as a possible ground for downward departure; rather, "the sentencing court must determine whether the factor, as occurring in the particular circumstances, takes the case outside the heartland of the applicable Guideline." *Id.* at 2051.

In evaluating this "heartland," the Supreme Court cited the Guidelines' own acknowledgment that "the Commission did not adequately take into account cases that are, for one reason or another, **unusual**." *Id.* at 2044 (quoting U.S.S.G. ch. 1, pt. A, Intro. Comment 4(b)) (emphasis added). The Court described the expected process as follows: "A district judge now must impose on a defendant a sentence falling within the range of the applicable Guideline **if the case is an ordinary one.**" *Id.* at 2044. The focus thus should be on whether the facts of a case are "unusual" --or not "ordinary" --with a sentencing court still largely free to tailor an appropriate sentence through departure if the answer is yes. "The relevant question is not, as the Government says, whether a particular factor is within the 'heartland' as a general proposition ... but whether the particular factor is within the heartland **given all the facts of the case.**" *Id.* at 2047. The Supreme Court explained that:

3

> The [Sentencing Reform] Act did not eliminate all of the district court's discretion, however. Acknowledging the **wisdom, even the necessity**, of sentencing procedures **that take into account individual circumstances**, 28 U.S.C. § 991(b)(1)(B), Congress allows district courts to depart from the applicable guideline range if "the court finds that there exists an aggravating or mitigating circumstance of a kind, **or to a degree**, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that **should** result in a sentence **different from that described.**"

116 S. Ct. at 2044 (quoting 18 U.S.C. § 3553 (b)). The Court emphasized that "[t]he Guidelines ... 'place essentially no limit on the number of potential factors that may warrant departure.'" *Id.* at 2051.

In *Koon*, the majority even upheld, as a valid basis for a downward departure under the facts of that case, the defendants' susceptibility to abuse in prison--a "discouraged factor" that the Commission had stated should not ordinarily be used as a basis for a downward departure. *Id.* at 2053. The Supreme Court also approved of departures based on an **aggregation of factors**, even if none of those factors, when considered alone, provided a sufficient basis to support a downward departure. *Id.* at 2053-54 (remanding for possible reimposition of downward departure despite recognition that district court had found none of the factors individually worthy of departure).

Consistent with *Koon*, the catch-all provision in U.S.S.G. § 5K2.0 authorized this Court generally to depart downward on grounds not specifically mentioned in the Guidelines, any time there exists a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission. U.S.S.G. § 5K2.0 ("Circumstances that may warrant departure from the guidelines pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance").

4

## Diminished Mental Capacity

Joann Hope is a battered child who falls within the clinical definition of what is commonly referred to as the Battered Child Syndrome. Ms. Hope was evaluated by Dr. Lenore Walker the psychologist who conducted the original studies that formed the standards for what is generally accepted today as the Battered Woman's Syndrome. Dr. Walker is the world's leading expert on the syndrome and its close relative the Battered Child Syndrome.

Dr. Walker met with Joann and conducted a clinical interview and testing on April 20, 2001 at the Federal Detention Center in Miami. The testing involved the administration of the Traumatic Stress Inventory (TSI). Based on the testing and interview, Dr. Walker determined that Joann has been the victim of long term physical beatings and emotional abuse at the hands of her natural father and a subsequent string of her mother's boyfriends. (A copy of Dr. Walker's report is attached hereto.) Joann was raised in an atmosphere of fear and violence where her father whom she described as "crazy" and subsequent live-in boyfriends of her mother perpetrated violence on the entire family including Joann and her sisters. The last boyfriend convinced Joann's mother to abandon Joann and her sister by putting "the two sisters up" in a $50.00 a week apartment in Liberty Heights. The girls were left to live on their own. Joann's mother would "drop by" once a month. Joann was 13 and her sister 14 at that time. Left to fend for herself, Joann turned to selling marijuana on the street to survive. This began her descent into the use and sale of drugs and eventually led to the instant offense.

Dr. Walker is of the opinion that the Battered Child Syndrome operated to impair Joann's cognitive and emotional functioning, create Post Traumatic Stress disorder and resulted in diminished mental capacity. This condition ultimately led to the circumstances involved in the instant offense. Dr. Walker will present her complete findings in the form of testimony at Joann's

5

sentencing.

The U.S.S.G. § 5K2.13 reads:

Diminished Capacity (Policy Statement)

> If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

Downward departures predicated upon "diminished capacity" are considered "encouraged departures." United States v. Rivera, 994 F.2d 942, 948 (1st Cir. 1993) ("In certain circumstances, the guidelines offer the district court . . . special assistance, by specifically encouraging departures . . . The individual guidelines do not take into account . . . an offender's 'diminished capacity' which circumstance, in the Commissions's view, would normally warrant a downward departure."). The Guidelines contain prohibited, encouraged and discouraged factors. The ground asserted here, diminished capacity, is an enumerated, encouraged ground to depart as set forth above in U.S.S.G. § 5K2.13. Thus, this Court's inquiry and authority to depart is the broadest permitted under the guidelines -- there is no requirement that this case be outside of the "heartland," nor is there a requirement that the factor be present in an extraordinary degree. See Koon v. United States, 518 U.S. 81, 116 S.Ct. 2035, 2045 (1996); see also Rivera, 994 F.2d at 948 (because diminished capacity is a specifically enumerated, encouraged basis for departing below the otherwise applicable guideline range, U.S.S.G. § 5K2.13, these "unusual" circumstances presumptively remove this type of case from the typical "heartland").

6

Thus, according to the analysis set forth in <u>Koon</u> for analyzing downward departures,[2] an encouraged factor, not otherwise taken into account in the Guidelines, <u>see</u> U.S.S.G. § 5K2.13 and <u>Rivera</u>, simply authorizes this Court to depart -- there is not need for the factor to be present to an exceptional degree or in some other way make the case distinct from the ordinary case, and, thus there is no discussion of the "heartland".[3]

The Battered Woman's Syndrome has been recognized as supporting a downward departure under U.S.S.G. § 5K2.13. <u>United States v. Ramos-Oseguera</u>, 120 F.3d 1028, 1041 (9th Cir. 1997) (overruled on other grounds); <u>United States v. Johnson</u>, 956 F.2d 894 (9th Cir. 1992). Both cases cite Dr. Walker as the expert supporting the proffered departure. Support is also found in *United*

---

[2] <u>Koon</u> provides that courts should employ the following analysis in deciding departure questions:

1) Is the "special factor" or ground asserted a forbidden basis for departure? If so, then no departure is permissible.

2) Is the "special factor" or ground asserted an encouraged basis for departure? If so, the court is authorized to depart if the applicable Guideline does not already take it into account?

3) Is the "special factor" or an encouraged factor already taken into account by the applicable Guidelines? If so, the court should only depart if the factor is present to an exceptional degree or in some other way makes the case distinct from the ordinary case.

4) Is the special factor unmentioned in the Guidelines? If so, the court must consider the "structure and theory of both relevant individual Guidelines and the Guidelines taken as a whole to decide whether this "special factor" is present in a sufficient degree to take the case out of the "heartland."

[3] In <u>Koon</u>, the Supreme Court explicitly distinguished between encouraged factors, or those explicitly referred to in the Guidelines as potential departure grounds, discouraged factors, or those which the Guidelines labels "those ordinarily not relevant" to the sentencing guideline range determination, and unmentioned factors, which can constitute grounds for departure but only if present in a sufficient degree to take the case out of the "heartland."

<u>Koon</u> specifically noted that departures on unmentioned grounds should be "highly infrequent," while departures on discouraged grounds should be relied upon only in "exceptional cases." By contrast, departures predicated upon encouraged factors, such as the motion contained in this pleading, "authorize[s] [the court] to depart if the applicable Guideline does not already take it into account." <u>Koon</u>, 116 S.Ct. At 2045.

7

*States v. Whitetail*, 956 F.2d 857 (8th Cir. 1991) (reversed so district judge could consider battered women's syndrome as downward departure).

WHEREFORE, the defendant requests that this court grant this motion for a downward departure.

>Respectfully submitted,
>
>KATHLEEN M. WILLIAMS
>FEDERAL PUBLIC DEFENDER
>
>By: _____
>Timothy M. Day
>Assistant Federal Public Defender
>Florida Bar No. 360325
>1 E. Broward Boulevard
>Suite 1100
>Fort Lauderdale, Florida 33301
>(954) 356-7436
>(954) 356-7556 (fax)

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was mailed on this 22 day of May, 2001 to Kathleen Rice, Esquire, United States Attorney's Office, 299 E. Broward Blvd., Fort Lauderdale, Florida 33301 and to Frances Weisberg, United States Probation Office, 299 E. Broward Blvd., Room 409, Fort Lauderdale, Florida 33301.

_____
Timothy M. Day

S:\DAY\Hope\DEPART.wpd

8

**DR. LENORE E. WALKER**
**LICENSED PSYCHOLOGIST**

Denver Offices
P.O. Box 101718
Denver CO 80250
(303) 322-3444
(303) 698-2952 fax

Florida Offices
915 Middle River Dr. #401
Ft. Lauderdale, FL 33304
(954) 920-1389, 567-0670
(954) 563-9771, 920-5972 fax

## PSYCHOLOGICAL REPORT

### JOANNE HOPE

### United States v. Joanne Hope
### Case No. 00-6347-cr-Zlock
### Reg. No. 55589-004

### Date of Birth: 2-24-72

### Date of Report: 04-23-01

**REASON FOR REFERRAL:**

Joanne Hope, a 29-year old single woman was referred for psychological evaluation by her attorney, Tim Day, in connection with Federal criminal charges against her for possession and sale of crack cocaine. She has two prior convictions in state court. She has reported a history of witnessing and experiencing abuse during her childhood and adult life. This evaluation is to assist the Court in determining if a downward departure is appropriate in her sentence.

**PROCEDURE:**

Joanne Hope was psychologically evaluated at the Federal Detention Center in Miami on April 20, 2001. A standard clinical interview with mental status exam was performed and the Traumatic Stress Inventory (TSI) was administered for a total of 2 ½ hours of face-to-face evaluation. In addition, the charges were reviewed and telephone calls were placed to her aunt and Godmother to verify some of the information collected. Information from her attorney was also reviewed.

**BRIEF RELEVANT HISTORY:**

Joanne Hope was born in Hollywood, Florida and moved back and forth between Broward and Miami/Dade counties during her childhood. She had an older brother and

sister who had both the same mother and father. She also had a large number of stepbrothers and stepsisters, most of whom she knew although they did not live in the same house. Her father denied that she was his child when she was born and she says her mother gave her to her mother's sister, her Auntie Bert, who raised Joanne until she was in second grade when her mother came and brought her home. By this time her mother had broken up with her father and was living with a man named Shaker. Later, her mother lived with other men who also beat her, including Tommy Scott who drove a car through the gate and Willie Barr who stabbed her mother and broke her leg. Joanne says she was scared of all these men.

Joanne describes her father as 'crazy' and says that 'something was wrong with him'. Apparently he had many different women in his life, sometimes more than one at a time and had many children with them. They all lived in the same neighborhood and Joanne witnessed her father's violent and abusive behavior. She gave several examples such as one time seeing him beating one woman, Patricia while the other woman with whom he was living, Annie just waited in line for her turn to be beaten. In another incident, he burned his Cadillac car in a field. She describes him as never doing anything for her or her sister, Nicole including not giving them any money towards their survival. One time she and Nicole asked him for money for school shopping. He gave them $2.00. They never asked again. Her father died of cancer last year.

Joanne describes Shaker as the man who her sister, Nicole thinks of as the father who raised her. Joanne does not think of him as a father although she spent time living together with him. Joanne says that he was cruel and abusive, beating them for anything. Although she and Nicole were very close, she says that Nicole would blame Joanne or their brother, Demetria, so she wouldn't get punished. In one example, Shaker bought oreo cookies and kept them in a jar in his room. No one was allowed to go into that room except Nicole or their momma. He must have counted the cookies and found that some were missing. Nicole was the one who ate them but she blamed Joanne and Demetria who got beaten or put on punishment. She describes the cactus tree that he grew and he would pick branches off of it to hit her in the head. She also described being beaten with the belt for his pants and electrical cords. Shaker also beat her mother, often in the head and one time he dragged her with a car. Joanne says that when the police would come, Shaker would make them all hide in a room and if the police did find them, then they had to say that nothing was wrong or they would get beaten worse.

Joanne describes Tommy Scott as extremely violent also. She was in 7th grade in middle school in Ft. Lauderdale at this time and she came home from school and found that she couldn't get into the house because she didn't have a key. She knew neither her mother nor Tommy Scott wanted her there and sometimes she would have to sleep under the bed to hide. If she was found there her mother would sometimes chase her with a broom. After a fight with her and her mother, who jumped on his back to defend Joanne, Tommy Scott insisted that Joanne move out of the house. Her mother found an apartment for Nicole and Joanne to move into in Liberty Heights and they began a life on the street at the time. Her mother paid $50 per week for this small apartment. They lived in the apartment for about two years. Eventually, her mother stopped paying the rent and

she and her sister were forced to go out on the street with everyone else in the neighborhood to sell some drugs just to get money for food.

Joanne met a woman named Veronica Scott (no relation to Tommy Scott) who lived in the neighborhood. Veronica Scott took Joanne into her home when she was about 15 or 16 years old, and from then on she tried to raise Joanne. By then, Joanne was using drugs as well as selling from time to time, just to make enough money to survive. She called Joanne her Goddaughter. Kevin was living there at first and he too called Joanne his Goddaughter. Eventually he went to prison. They didn't want Joanne to be involved with drugs and hoped she would go back to school, but she didn't. At that time, Nicole had her first child, who is now about 16 years old and they were living with Nicole's boyfriend.

During this time Joanne says that her Auntie Bert wanted her to move back with her. However, she was sick with cancer and had some kind of 'thing' in her throat that blood came out when she would talk. Joanne said she 'couldn't take it' and cried a lot. At one time when Joanne was there, her aunt got so sick that they rushed her to the hospital where she almost died. Joanne says she couldn't go back there. Her other aunt, Willie May Williams was also occasionally involved with the family but basically was not much support. Joanne describes her brother, Demetria as having been in prison all his life. The most he has been free has been for 3 to 4 months. Her sister has been in prison as have most of the others who lived on the streets, including Joanne. Various people in the neighborhood have assisted in raising Nicole's daughter and now, her infant son. At one time, Tommy Scott kidnapped Nicole's daughter and threatened to kill the child if their mother didn't come to see him. Their mother now lives in Georgia with another boyfriend. More recently, Nicole went to live in Shaker's back room and her baby was with a friend.

**FINDINGS:**

Joanne Hope's life story is one filled with violence and drugs from the time she was a young child. She was rejected by her father, sent away by her mother, and learned to survive in the most difficult of circumstances. The men in her life were abusive to her and the women were all so involved in their own survival that they did not have the ability to protect or nurture her. Although she is 29 years old, she appears more like an adolescent. It is possible that her emotional development did arrest at the adolescent stage when she was forced to live on her own with her sister, especially after their mother stopped paying the rent. She prefers not to have relationships other than friendships with men. The trauma that this woman has experienced has been enormous. The fact that she has survived under these circumstances is an indication of strengths that she has developed over the years. At the same time, she has no skills other than street smarts.

Children who are rejected and abused often become 'older' than their chronological age in some areas and 'younger' than their age in other areas. Their personality development may be impacted upon so that they become numb to things they must do in order to survive. They may dissociate their behavior from their self-image.

Joanne demonstrates many of the characteristics seen in abused children. However, she has some strengths including her ability to form and keep relationships with people in her life including her sister, aunts, and mother-figures. She states that she is eager to get her GED and begin to develop skills that will allow her to support herself in other than illegal drug activities.

### Test Results

The findings from the Trauma Symptom Inventory (TSI) support Joanne's description of a severely traumatic childhood and adult life. Her results are consistent with severe damage in the ten clinical areas that the TSI measures. This includes high levels of anxious arousal, depression, anger and irritability, intrusive experiences, defensive avoidance, dissociation, sexual concerns and dysfunctional behavior, low self-esteem and tension reduction behavior including substance abuse.

Those who are exposed to trauma often develop changes in three major areas. The first is having recurrent intrusive experiences of the abuse including nightmares, feeling as if the trauma was reoccurring, and psychophysiological symptoms. The second and third are often called the fight or flight response to danger. If danger is perceived, the person's nervous system becomes aroused and the autonomic nervous system works to secrete biochemicals that help to prepare for defense. If the person is able to flee, then they can leave the dangerous situation. But, children can't physically leave so they learn to mentally leave which may be called depression, repression, denial, dissociation, minimization and becoming emotionally numb. Those who survive often develop good manipulative skills, some of which are critical to those who we term, 'street survivors'. Joanne demonstrates all of these expected changes. In addition to becoming emotionally numb through psychological processes, she also was addicted to crack cocaine, which kept her from feeling her hunger and dealing with her emotional and perhaps physical pain. She reports nightmares where someone is chasing her, trying to shoot and kill her. She wakes herself up and her roommate says that Joanne looks very scared. Her previous roommate said that Joanne cried a lot while she was sleeping. She doesn't remember doing this but says that she cries very easily.

### Diagnosis

Joanne Hope can be diagnosed as having a substance disorder with her drug of choice being crack cocaine. She has been addicted to crack since she was a teenager. She also has a diagnosis of a Post Traumatic Stress Disorder that has impacted upon her personality development. The diagnostic category in the DSM-IV is called DESNOS and is used for those who have developed personality characteristics from living in an extremely stressful environment with constant trauma and danger.

### CONCLUSIONS:

It is my professional opinion that Joanne Hope was abused as a child and as an adult and as a result has developed limitations to her cognitive and emotional functioning

that is typical for abuse victims. She was forced to live on the streets as a young child, never finished her education, and learned to use and sell drugs as a way of getting enough to eat, like everyone else around her. She does not appear hardened to street life, although she has lived this way for many years. She does have strengths that have assisted her survival. She is able to engage with people and develop and maintain relationships. In addition, she has begun to take responsibility for completing her school education by taking the exam to place her in the appropriate GED class. She has signed up for drug treatment classes and is awaiting placement when it becomes available. She appears to be realistic about the seriousness of the charges and her motivation to change her lifestyle and develop more realistic skills seems to be genuine.

Lenore E. Walker, Ed.D., A.B.P.P.
Diplomate in Clinical Psychology